1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  MYASSAR ELIAS NADDOUR,        )   Civil No.: 13-1407-BAS(WVG)
                                  )
12              Plaintiff,        )   **REPORT AND**
                                  )   **RECOMMENDATION:**
13                                )
    v.                            )   **GRANTING PLAINTIFF'S**
14                                )   **MOTION FOR SUMMARY**
    CAROLYN W. COLVIN, Acting     )   **JUDGMENT**
15  Commissioner of Social Security )   **(DOC. NO. 11)**
                                  )
16              Defendant.        )   **DENYING DEFENDANT'S**
                                  )   **CROSS-MOTION FOR**
17  _____   )   **SUMMARY JUDGMENT (DOC.**
                                      **NO. 13)**
18
                                      **REMANDING ACTION TO**
19                                    **ADMINISTRATIVE LAW JUDGE**

20
        On June 17, 2013, Plaintiff Myassar Elias Naddour ("Plaintiff"), filed a
21
    Complaint against Carolyn W. Colvin, Acting Commissioner of Social Security,
22
    ("Defendant"), appealing the decision of an Administrative Law Judge ("ALJ") of the
23
    San Diego Office of Disability Adjudication and Review ("ODAR"), denying him
24
    disability insurance benefits. (Doc. No. 1.)
25
        On September 27, 2013, Defendant filed an Answer to Plaintiff's Complaint.
26
    (Doc. No. 6.) On December 5, 2013, Plaintiff filed a Motion for Summary Judgment.
27
    (Doc. No. 11.) On December 19, 2013, Defendant filed a Cross-Motion for Summary
28
    Judgment and Opposition to Plaintiff's Motion for Summary Judgment. (Doc. No. 13.)

13cv1407

On January 4, 2014, Plaintiff filed an Opposition to Defendant's Motion for Summary Judgment and Reply to Defendant's Opposition. (Doc. No. 14.)

The Court, having reviewed Plaintiff's Complaint, Defendant's Answer, Plaintiff's Motion for Summary Judgment, Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion to Summary Judgment, Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Reply to Defendant's Opposition, and the Administrative Record ("AR") filed by Defendant, hereby RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED in part and DENIED in part, Defendant's Cross-Motion for Summary Judgment be GRANTED in part and DENIED in part, and the case be remanded to the Administrative Law Judge for further proceedings.

## I.

## SUMMARY OF APPLICABLE LAW

The Social Security Act, 42 U.S.C. § 401, et seq. ("the Act"), under which the Social Security Administration ("SSA") provides benefits to certain disabled individuals, creates a system by which the SSA determines who is entitled to benefits, and by which unsuccessful claimants may seek review of adverse determinations. Defendant, as Commissioner of the SSA, is statutorily responsible for the administration of the Act. To qualify for disability benefits under the Act, a claimant must show that (1) he or she suffers from a medically determinable impairment that can be expected to result in death, or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the claimant incapable of performing work that he or she previously performed, or any other substantially gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), (2)(A). The claimant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which his or her disability insured status expired. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A. <u>SSA'S FIVE-STEP SEQUENTIAL PROCESS</u>

Under the authority of the Act, the SSA has established a five-step process for determining whether an individual is disabled. 20 C.F.R. § 404.1520(a). The steps are followed in order. If it is determined that the claimant is disabled or is not disabled at a given step of the evaluation process, the evaluation will not go on to the next step. 20 C.F.R. § 404.1520(a)(4).

At **step one**, the ALJ determines whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. 404.1520(a)(4)(i). SGA is defined as work activity that involves doing significant physical or mental activities, 20 C.F.R. 404.1572(a), <u>and</u> work that is usually done for pay or profit, whether or not a profit is realized. 20 C.F.R. 1572(b). If the claimant is engaging in SGA, disability benefits are denied. If the claimant is not engaging in SGA, the ALJ proceeds to **step two**, which determines whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. 404.1520(c). That determination is governed by the "severity regulation," which provides in relevant part:

> If [claimant does] not have any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities, [the SSA] will find that [claimant does] not have a severe impairment and [is], therefore, not disabled. [The SSA] will not consider [claimant's] age, education, and work experience.

20 C.F.R. §§404.1520(c), 416.921(c).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). If the claimant is determined to not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to **step three**, which considers whether the impairment or combination of impairments is equivalent to one of a number of listed impairments that the SSA acknowledges are so severe as to preclude SGA. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If

the claimant's impairment or combination of impairments is not one that is conclusively presumed to be disabling, the evaluation proceeds to the fourth step.

Prior to step four, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). 20 C.F.R. § 404.1520(e). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis, despite limitations from his or her impairments. See 20 C.F.R. § 404.1520. To determine the claimant's RFC, the ALJ must assess relevant medical and other evidence and consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(3). In **step four**, the ALJ determines whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. § 404.1520(f). The term "past relevant work" means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) during the last fifteen years or fifteen years prior to the date that disability must be established. In addition, the work must have been SGA and have lasted long enough for the claimant to learn to do the job. 20 C.F.R. §§ 404.1560(b), 404.1565. If the claimant has the RFC to do his or her past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work, or does not have any past relevant work, the analysis proceeds to the fifth and final step of the sequential evaluation process.

At **step five**, the ALJ must determine whether the claimant is able to do any other work considering his or her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). If the claimant is able to do other work, he is not disabled. Id. If the claimant is not able to do other work and meets the duration requirement, he is disabled. Id. The claimant bears the initial burden of proving disability in steps one through four of the analysis. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)). However, if a claimant establishes an inability to perform past work, the burden shifts to the SSA in step five to show that the claimant can perform other substantial gainful work. Id. In order to support a finding that an individual is not disabled at this step, the SSA is responsible for providing

13cv1407

evidence to demonstrate that other work exists in significant numbers in the national economy that the claimant can perform, given his RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 404.1560(c).

### B. SSA HEARINGS AND APPEALS PROCESS

Under direct delegation from Defendant, the ODAR administers a nationwide hearings and appeals program. SSA regulations provide a four-step process for administrative review of a claimant's application for Federal Disability Insurance Benefits ("DIB") and SSA payments. See generally 20 C.F.R. §§ 404.900, et seq., 416.1400, et seq. A decision is made at the initial, reconsideration, ALJ, and Appeals Council levels. Id. If the claimant is not satisfied with the decision at any step of the process, he has sixty days to seek administrative review. See 20 C.F.R. 404.907, 404.929, 404.933, 416.1407, 416.1429, 416.1433. If the claimant does not request review, the decision becomes binding. See 20 C.F.R. §§ 404.905, 416.1405.

Applications for disability benefits are initially processed through a network of SSA field offices and state disability determination services. The process begins when a claimant completes an application and an adult disability report, and submits the documents to one of SSA's field offices. If the claim is denied, the claimant is entitled to a hearing before an ALJ in SSA's ODAR, where the ALJ will review the claim. 20 C.F.R. § 404.929. The SSA employs ALJs to adjudicate claims under the Act for claimants who are not satisfied with the administrative determination of their case and have requested an administrative hearing. 20 C.F.R. §§ 404.933, 416.1429. Hearings before ALJs are informal and non-adversarial proceedings. 20 C.F.R. § 404.900(b). The claimant may have an attorney or non-attorney act as his representative at the hearing, or the claimant has the option of representing him or herself. Id. If the claimant receives an unfavorable decision by an ALJ, he may seek review by the Appeals Council. 20 C.F.R. § 416.1455.

The Appeals Council, also part of ODAR, acts on claimant requests for review of unfavorable decisions issued by ALJs. The Appeals Council will either grant, deny,

13cv1407

or dismiss a claimant's request. If a claimant disagrees with the decision of the Appeals Council, or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court pursuant to 42 U.S.C. Section 405(g), Section 1383(c). See 20 C.F.R. §§ 404.981, 416.1481. The Appeals Council also has the power to review an ALJ's decision *sua sponte* within sixty days of the decision. 20 C.F.R. § 416.1481. If a federal district court remands the claim, it will be sent to the Appeals Council, and remanded with instructions to an ALJ for further review.

## II.

## PROCEDURAL HISTORY

On March 21, 2010, Plaintiff filed an application for disability insurance benefits pursuant to the Act. (AR 74.) Plaintiff specified March 21, 2009 as the onset date of his alleged disability. (AR 194, 198.) On July 28, 2010, the SSA denied Plaintiff's initial application, and on December 20, 2010, the application was denied on reconsideration. (AR 79-82, 83-87.) On February 24, 2011, Plaintiff filed a written request for a hearing before an ALJ. (AR 88.)

On February 7, 2012, Plaintiff, who was represented by counsel, appeared at a hearing before ALJ Edward D. Steinman in San Diego. (AR 12-23.) Plaintiff testified at the hearing, as did medical expert, Dr. John Axline, and vocational expert, Connie Guillory. (AR 33-49, 49-63, 63-69.)

On February 17, 2012, the ALJ issued an unfavorable decision, finding that Plaintiff was not disabled from March 21, 2009, through the date of the decision. (AR 23.) The ALJ determined that Plaintiff had the RFC to perform "light work," as that term is defined in 20 C.F.R. Section 404.1567(b), consisting of simple repetitive tasks. (AR 15, 21.) Accordingly, the ALJ determined that Plaintiff is unable to perform his past relevant work as an auto salesperson. (AR 21.) However, in consideration of Plaintiff's age, education, work experience, RFC, and the vocational expert's testimony, the ALJ found that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (AR 22.) Plaintiff appealed the decision of the

13cv1407

ALJ to the Appeals Council, which was denied on May 2, 2013. (AR 1.) Plaintiff then brought this action.

### III.

### STATEMENT OF FACTS

#### A. GENERAL BACKGROUND

Plaintiff was born on May 10, 1962. (AR 74.) Plaintiff has not been employed since March 21, 2009 (the alleged onset date of Plaintiff's disability). (AR 34.) Prior to this date, Plaintiff was employed as an automobile salesman dating back to 1991. (AR 33.) Plaintiff has a history of reported lower back pain dating back to 1995, which he asserts has precluded him from maintaining his previous auto sales position. (AR 18, 198.) Specifically, Plaintiff complains of pain and muscle spasms in his lower back, which radiates down into his right leg, with diminished feeling in his right foot. (AR 35-36, 46.)

At the administrative hearing before the ALJ, Plaintiff testified that according to a MRI taken of his spine, he has "three bad discs," which are surgically irreparable. (AR 34.) To combat the pain, Plaintiff utilizes a variety of treatments including various pain medications. (AR 36-37.) However, Plaintiff complained of experiencing relatively severe mental and physical side effects from these drugs, including fatigue, drowsiness, and internal bleeding. (AR 37-38, 47.) Moreover, Plaintiff indicated that his physical impairments preclude him from lifting more than two pounds, sitting for more than twenty minutes without changing positions, walking for more than twelve minutes, and standing for more than five to ten minutes. (AR 38-40.) Plaintiff also asserted that he uses a cane twenty percent of the time as an assistive walking and standing device. (AR 39.)

In lieu of surgery, Plaintiff explained that he treats his pain with physical therapy, stretching, massages, exercising, pain medication, injections, and a TENS

13cv1407

machine.[1] (AR 34, 36-37, 46, 48.) Plaintiff testified that upon waking in the morning, he stretches for one hour, followed by more stretching in the shower. (AR 42.) Plaintiff also walks to the fitness center located in his apartment complex for exercise, but does not use any of the equipment. Id. He explained that he typically needs to lie down for an hour five to six times a day. (AR 43-44.) Plaintiff further testified that he has the ability to drive for five or ten minutes to run light errands, but is unable to accomplish other household tasks such as preparing meals, vacuuming, grocery shopping, yard work, or laundry. (AR 42, 48.)

Dr. John Axline, a medical expert, testified at the administrative hearing. (AR 49-63.) Dr. Axline did not personally examine Plaintiff, but relied on the medical evidence in the administrative record to render his opinion. Dr. Axline explained there were three health issues under consideration: psychiatric problems, hypertension, and lumbar spine issues. (AR 49-50.) Dr. Axline assessed each of these, and deemed that the psychiatric problems were not severe, and the hypertension was asymptomatic and well-controlled. Id. The lumbar spine was the "main area of focus" for the purposes of determining Plaintiff's disability benefits. (AR 50.) Ultimately, Dr. Axline disagreed with the prognoses of Plaintiff's treating physicians, Dr. Kim and Dr. Yorobe (see infra Part III.B.1-2.)

Dr. Axline contrasted two MRIs taken of Plaintiff's lumbar spine, one taken in February 2007 and one in December 2009, and concluded that Plaintiff's spine was improving, as the 2007 MRI showed a herniated disc which the 2009 MRI indicated had largely reduced in size without surgery.[2] (AR 52.) He also referred to a neurological examination of Plaintiff taken in 2010, which he explained showed normal motor skills

---

[1] A TENS machine is the acronymic name given to a transcutaneous electrical nerve stimulation device. It is a back pain treatment that uses low voltage electric current to relieve pain. TENS for Back Pain, WebMD, http://www.webmd.com/back-pain/guide/tens-for-back-pain. (Last visited June 11, 2014.)

[2] "A herniated disk refers to a problem with one of the rubbery cushions (discs) between the individual bones (vertebrae) that stack up to make your spine. . . [A] herniated disk occurs when some of the softer 'jelly' pushes out through a crack in the tougher exterior. A herniated disk can irritate nearby nerves and result in pain, numbness or weakness in an arm or leg." Diseases and Conditions - Herniated Disk, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/herniated-disk/basics/definition/con-20029957(last visited June 12, 2014).

and reflexiveness, with only subjective decreased sensation in the right foot, which did not interfere with its function. (AR 53.) Dr. Axline explained that such "discogenic nerve impairment"[3] may equal or meet a listing described in 20 C.F.R. § 404.1520(d), but because the sensory impairment here is subjective, localized, and has been treated, it does not rise to the level of severity necessary to establish itself as a disability precluding SGA under that section. (AR 53-54.)

Finally, the ALJ asked Dr. Axline about the medications that Plaintiff was taking, and the complained of side effects. (AR 54.) Dr. Axline testified that some of the drugs Plaintiff was taking should not have exhibited any side effects (such as Motrin), and the other side-effects seemed to have been well-tolerated by Plaintiff based upon the amount Plaintiff was consuming, the length of time he had been taking them, and Plaintiff's competent level of functioning while experiencing the side-effects. (AR 54-55.) Accordingly, Dr. Axline dismissed the side-effects from being a serious problem. (AR 55.)

The ALJ provided Plaintiff's counsel ("Counsel") an opportunity to question Dr. Axline. Counsel inquired of Dr. Axline as to the significance of a finding of zero reflexes in Plaintiff's lower extremities during Plaintiff's neurological examination, and whether that is considered "normal." (AR 58-59.) Dr. Axline responded that a finding of zero reflexes could be considered normal if there are no "pathologic reflexes."[4] (AR 60.) Counsel then stated that an x-ray of Plaintiff's spine showed the Plaintiff exhibited a "vacuum disc," and asked what a vacuum disc is and whether it would be considered a source of chronic pain. (AR 60.) Dr. Axline explained that a vacuum disc is where a disc is not solid, and is "kind of like a cavity or split inside the disc indicat[ing]

---

[3] "'Discogenic syndrome' . . . refers to pain that pertains to or originates in an invertebral disk. . . . Discogenic pain is often caused by a bulging, herniation, or thinning of a disc." Discogenic Syndrome, Laser Spine Institute, http://www.laserspineinstitute.com/back_problems/spinal_anatomy/discogenic_syndrome/ (last visited June 12, 2014).

[4] Pathologic reflexes are "abnormal responses to normal stimuli[,]" which are caused by "lesions of the pyramidal path that conducts impulses from the cerebral cortex to the spinal cord." Pathological Reflexes, Right Diagnosis, http://www.rightdiagnosis.com/sym/pathological_reflexes.htm (last visited on July 11, 2014), Pathological Reflexes, Survinat, http://survinat.com/2012/06/pathological-reflexes/ (last visited on July 11, 2014).

degeneration." Id. However, Dr. Axline noted that a vacuum disc actually does not cause chronic pain and is typically asymptomatic, citing a study conducted on MRI patients. Id.

Dr. Axline ultimately suggested that Plaintiff should avoid any heavy lifting because of Plaintiff's symptomatic lumbar disc disease, and that Plaintiff could lift ten pounds frequently and twenty pounds occasionally. (AR 55.) He further opined that Plaintiff can (1) sit for two hours at a time, for a total of six hours in an eight-hour day, (2) stand for one hour at a time, for a total of two hours in an eight-hour day, and (3) walk for two hours at a time, for a total of four hours in an eight-hour day. (AR 55-56.)

Ms. Connie Guillory, a vocational expert, also testified at the administrative hearing. (AR 63-69.) The ALJ posed eight hypothetical questions to Ms. Guillory to determine the extent of work and which types of positions may be available to Plaintiff.[5] Id. The first hypothetical question considered whether a younger individual with prior work experience as an auto salesperson would be able to continue his/her prior work where he/she had one year of college education, could lift fifty pounds occasionally and twenty-five pounds frequently, could sit, stand, and walk six hours in an eight-hour workday, frequently pushing and pulling, with a non-severe affective disorder consisting of mood disturbance accompanied by a manic or depressive syndrome, but whom should avoid ropes, ladders, and scaffolds. (AR 63.) Ms. Guillory responded that the individual described in the hypothetical question would be able to perform his/her prior work activities. Id.

The second hypothetical question the ALJ posed to Ms. Guillory was based on the July, 2010 psychiatric evaluation of Plaintiff assessed by Dr. Gregory Nicholson, wherein Plaintiff was determined to exhibit panic disorder, depressive disorder, a global

---

[5] The fourth, sixth, and seventh hypothetical questions are not dispositive on nor pertinent to the issues of this case. Therefore, they shall not be addressed.

13cv1407

assessment of functioning score of 60,[6] dysphoria, neuro-vegetative signs, with mild to no psychological limitations. (AR 63-64.) Again, Ms. Guillory indicated that the individual depicted in the second hypothetical question would be able to pursue his/her prior work. (AR 64.)

The third hypothetical question addressed Dr. Edwin M. Yorobe's August 2011 assessment of Plaintiff wherein he determined that Plaintiff could lift ten pounds occasionally and less than ten pounds frequently, could stand, walk, and sit less than two hours in an eight-hour workday, exhibits postural limitations reaching, pushing, and pulling, and should avoid exposure to extreme cold, heat, and wetness. (AR 64.) The hypothetical question also indicated that the individual would miss more than three workdays per month. Id. Ms. Guillory testified that the individual posed in the hypothetical question would not be able to pursue full-time employment. Id.

The fifth hypothetical question was based on Dr. Choll Kim's prognosis of Plaintiff, which was similar to Dr. Yorobe's, wherein an individual could lift ten pounds occasionally and less than ten pounds frequently, sit for less than two hours in an eight-hour workday, stand and walk less than two hours in an eight-hour workday, and would have to miss work more than three times monthly. Id. Again, Ms. Guillory testified that the individual posed in the hypothetical question would not be able to pursue full-time employment. Id.

The seventh hypothetical question posed to Ms. Guillory by the ALJ asked her to consider the opinion of the testifying medical expert, Dr. Axline. (AR 65.) The hypothetical question described an individual who could left twenty pounds occasionally and ten pounds frequently, sit for two hours at a time for a total of six hours in an eight-hour workday, stand for one hour at a time for a total of two hours in an eight-

---

[6] "The Global Assessment Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum." A score of 100 indicates "superior functioning," whereas a score of 60 indicates "[m]oderate symptoms . . . [or] any moderate difficulty in social, occupational, or school functioning." GAF Score, http://www.gafscore.com/ (last visited June 18, 2014).

hour workday, and walk for two hours at a time for a total of four hours in an eight-hour workday. Id. The hypothetical individual faced no limitations on the use of his/her upper extremities, his/her vision, his/her hearing or communicative abilities, and environmental conditions. Id. The ALJ also limited this hypothetical individual to simple, repetitive, non-public tasks with limited contact with peers and supervisors. Id. Again, Ms. Guillory testified that this individual would not be able to return to their prior work as an auto salesperson, and limited any potential employment to light and sedentary work consisting of positions such as an inventory clerk, a cleaner, or a sealer. (AR 65-68.)

Finally, the eighth hypothetical question considered Plaintiff's own estimation of his potential work capacity, wherein he testified his right hand "locks up" on occasion, that he could lift one to two pounds, sit for ten to fifteen minutes and for twenty minutes over an eight-hour period, stand and walk twenty percent of the time using a cane, walk for twelve minutes, and needs bed rest for up to six hours daily. (AR 69.) Ms. Guillory testified that Plaintiff would not have the capacity to pursue any work under these conditions. Id.

The ALJ permitted Plaintiff's counsel to question Ms. Guillory. Counsel asked her to assume an individual who would need to lie down for at least two hours a day, and whether any work would be available. Id. Ms. Guillory responded that no work would be available for this person. Id.

Prior to the termination of the hearing, Counsel requested the ALJ to rely on the opinion and prognosis of Dr. Choll Kim, who Counsel explained is one of Plaintiff's treating physicians and is the director of spinal surgery at the Spine Institute of San Diego. (AR 70.) Counsel also noted inconsistencies between the testimony of Dr. Axline and the administrative record. First, he disagreed with Dr. Axline's opinion that Plaintiff's pain is well-controlled, based on Dr. Kim's records. Id. Second, Counsel

13cv1407

noted that Dr. Axline's prognosis of no radiculopathy[7] was inconsistent with records found at Exhibit 15F, page 2, and Exhibit 32F, page 20. Id. Finally, Counsel noted that Dr. Axline's opinion that Plaintiff's decreased sensation in his right foot was subjective was not corroborated by Dr. Kim's prognosis that Plaintiff has "multiple areas of continued decreased sensation and weakness of the right foot . . . [evidenced in Exhibit] 31F, [page] four." (AR 71.)  Finally, Counsel referenced Plaintiff's positive result on his straight-leg raise test,[8] radiculopathy, and zero reflexes of Plaintiff's lower extremities as objective evidence of Plaintiff's claims of severe impairment (noted in Exhibit 23F). (AR 72.)

**B. MEDICAL HISTORY**

**1. Treatment with Edwin Yorobe, M.D.**

Dr. Yorobe is Plaintiff's primary care physician. (AR 50.) The administrative record contains copious progress record notes from Dr. Yorobe, but most are largely illegible. (See Exhibit 4F at AR 277-80, Exhibit 13F at AR 396, Exhibit 22F at AR 493-509, & Exhibit 33F at AR 724.) The following paragraphs of this section summarize the legible portions of these notes, of which are pertinent to this Report and Recommendation.

On March 26, 2004, Dr. Yorobe recorded that Plaintiff had hurt his back playing billiards two days prior; this is the first indication that Plaintiff was experiencing back problems. (AR 491.) At this point, Dr. Yorobe prescribed Plaintiff Vicodin for his back pain. Id.

---

[7] "Cervical radiculopathy is the damage of disturbance of nerve function that results if one of the nerve roots near the cervical vertebrae is compressed." Cervical Radiculopathy, WebMD, http://www.webmd.com/pain-management/pain-management-cervical-radiculopathy (last visited June 20, 2014).

[8] "Straight-leg tests are done to help find the reason for low back and leg pain. . . . If you have pain down the back of your leg below the knee when your affected leg is raised, the test is positive (abnormal). It means that one or more of the nerve roots leading to your sciatic nerve may be compressed or irritated." Straight-Leg Test for Evaluating Low Back Pain, WebMD, http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-overview (last visited July 8, 2014).

On May 9, 2005, Dr. Yorobe issued Plaintiff a prescription for Viagra, which was subsequently refilled numerous times. (See AR 494, 507, 509, 279, 280.) On August 4, 2005, Dr. Yorobe noted that Plaintiff was traveling to an area where malaria was epidemic. (AR 495.)

On January 18, 2006, Plaintiff reported experiencing low back pain to Dr. Yorobe. (AR 496.) This complaint was repeated to Dr. Yorobe on April 4, 2006, (AR 497) September 7, 2006, (AR 498) October 1, 2009, (AR 507), and April 14, 2010. (AR 509.) Dr. Yorobe referred Plaintiff to a chiropractor on the September 7, 2006 visit. (AR 498.) On October 9, 2007, Dr. Yorobe noted that Plaintiff's low back pain was now radiating down into his right thigh. (AR 501.) On that date, Dr. Yorobe prescribed a TENS unit for Plaintiff. Id. On April 16, 2008, Dr. Yorobe diagnosed Plaintiff with multilevel disc disease and prescribed Plaintiff Tylenol for the pain. (AR 503.)

On March 25, 2009, Plaintiff reported to Dr. Yorobe that his legs were "tightening up." (AR 505.) This complaint was reiterated on April 14, 2010, with Plaintiff explaining that this symptom was getting worse. (AR 280, 509.) On July 19, 2010, Plaintiff indicated to Dr. Yorobe that he was experiencing continued cramping in his right hand. (AR 508.)

On August 10, 2011, Dr. Yorobe again assessed Plaintiff and reported that Plaintiff was suffering from back pain which radiated into the back of his thighs (right thigh worse than left), restless legs syndrome,[9] and possible fybromyalgia.[10] (AR 724.)

On August 17, 2011, Dr. Yorobe ultimately opined that Plaintiff is able to lift ten pounds occasionally and less than ten pounds frequently, stand, walk, and sit less than two hours in an eight-hour workday, sit for fifteen minutes before needing to

---

[9] "People with restless legs syndrome have uncomfortable sensations in their legs . . . and an irresistible urge to move their legs to relieve the sensations. The condition causes an uncomfortable, 'itchy,' 'pins and needles,' or 'creepy crawly' feeling in the legs." Restless Legs Syndrome, WebMD, http://www.webmd.com/brain/restless-legs-syndrome/restless-legs-syndrome-rls (last visited June 24, 2014).

[10] "Fibromyalgia syndrome affects the muscles and soft tissue. Symptoms include chronic muscle pain, fatigue, sleep problems, and painful tender points or trigger points . . . ." Fibromyalgia Health Center, WebMD, http://www.webmd.com/fibromyalgia/default.htm (last visited June 24, 2014).

change positions, stand for ten minutes before needing to change positions, must walk around for fifteen minutes every thirty minutes, and will need to lie down once or twice throughout a work shift. (AR 673.) Dr. Yorobe indicated that Plaintiff suffers from postural and physical function limitations, and should be restricted from certain environmental conditions. (See AR 673-74.) Dr. Yorobe predicted that Plaintiff would be absent from work more than three times a month, and does not have the ability to pursue full-time employment. (AR 674.)

### 2. Treatment with Spine Institute of San Diego - Choll Kim, M.D.

Dr. Choll Kim served as Plaintiff's treating physician through his visits to the Spine Institute of San Diego. On November 20, 2009, Dr. Kim provided a spinal consultation and evaluation on behalf of Plaintiff. (AR 265-68.) Dr. Kim recorded that Plaintiff's gait was brisk and coordinated, with no tenderness over Plaintiff's sacroiliac joint.[11] (AR 267.) However, Dr. Kim reviewed x-rays taken of Plaintiff's lumbar spine (taken on October 13, 2009) and concluded that "there is complete disc space collapse at L5-S1 with a steep sacral inclination and a vacuum disc[,]" and that Plaintiff exhibited degenerative disc disease at L4-5 and L3-4.[12] Id. Dr. Kim noted that Plaintiff showed signs and symptoms indicating lumbar spondylosis[13] with likely steno-sis/radiculopathy.[14] Id. Dr. Kim ordered an MRI to be taken of Plaintiff's spine for further review. Id.

---

[11] "Dysfunction in the sacroiliac joint . . . is thought to cause low back and/or leg pain." Sacroiliac Joint Dysfunction (SI Joint Pain), Spine-Health, http://www.spine-health.com/conditions/sacroiliac-joint-dysfunction/sacroiliac-joint-dysfunction-si-joint-pain (last visited June 20, 2014).

[12] "Degenerative disc disease is . . . a term used to describe the normal changes in [one's] spinal discs as [they] age." Degenerative Disc Disease - Topic Overview, WebMD, http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview (last visited June 20, 2014).

[13] "Lumbar Spondylosis is a medical condition in which the patient feels chronic pains in the lower part of the vertebral column due to the misplacement of the vertebrae." Lumbar Spondylosis Definition, Lumbar Spondylosis, http://www.lumbarspondylosis.net/ (last visited June 20, 2014).

[14] "Spinal stenosis is the narrowing of spaces in the spine (backbone) which causes pressure on the spinal cord and nerves." Back Pain Health Center, WebMD, http://www.webmd.com/back-pain/guide/spinal-stenosis (last visited June 20, 2014).

The MRI of Plaintiff's spine was taken on December 30, 2009. (AR 269.) Dr. Kim reviewed the results of the MRI and reported that it showed "L3-4, L4-5 and L5-S1 spondylosis with disc degeneration. At L5-S1 there is an annular tear . . . [and t]here is moderate stenosis at each of the levels." (AR 269, 273-74, 600-02.) Dr. Kim assessed that Plaintiff has signs and symptoms consistent with lumbar spondylosis with radiculitis, and the symptoms were gradually worsening. (AR 602.) Dr. Kim prescribed a series of injections for Plaintiff's pain, and scheduled a time for reassessment thereafter. Id. After Plaintiff received the prescribed injections, he reported to Dr. Kim experiencing approximately six to twelve hours of relief, depending on the place of injection. (AR 597.) Dr. Kim prescribed more physical therapy for Plaintiff, and scheduled a follow-up visit to reassess Plaintiff. (AR 598-99.)

Progress notes from the follow-up examination dated October 25, 2010 indicate that Plaintiff experienced a 30%-40% improvement in overall pain following the physical therapy. (AR 595.) Dr. Kim noted that Plaintiff's gait was brisk with good coordination, and that Plaintiff was able to rise from a lying down position without difficulty. Id. Dr. Kim advised Plaintiff to continue his physical therapy regimen, and that if no significant progress had been made by the time of the next reassessment, they would start to consider more invasive procedures such as surgery. (AR 595-96.)

Dr. Kim's progress notes dated January 24, 2011 report that Plaintiff was undergoing physical therapy and taking Vicodin and Motrin, and experienced improvements in some aspects of his pain, but continued and increased levels of pain in other aspects. (AR 591.) Dr. Kim also noted that Plaintiff's gait was slow with marked antalgia[15] on the right side, that is wide-based with Plaintiff slightly leaning forward. Id. Dr. Kim also noted that Plaintiff was now having difficulty raising from a lying down position. Id.

---

[15] An antalgic gait is a term used to describe a method of walking to remove or displace pain. Antalgia, The Back Pain Authority, http://www.cure-back-pain.org/antalgia.html (last visited June 23, 2014).

13cv1407

Dr. Kim's final progress notes dated April 18, 2011 report that Plaintiff continued to display a slow gait with antalgia on the right side. (AR 593.) He also noted that Plaintiff continued to experience significant pain and disability, and had developed pain in multiple additional areas as well. Id. On August 9, 2011, Dr. Kim reported that Plaintiff's medication and physical therapy regiments were helping, and that Plaintiff's gait was slightly more brisk. (AR 687.) However, Dr. Kim also noted that Plaintiff's pain remained relatively unchanged in terms of character. Id.

On August 22, 2011, Dr. Kim ultimately opined that Plaintiff could carry ten pounds occasionally and less than ten pounds frequently, walk less than two hours in an eight-hour workday, sit for less than two hours in an eight-hour workday, stand for ten minutes at a time before needing to change positions, must walk around for fifteen minutes every thirty minutes, and would need to lie down periodically throughout the day. (AR 681.) Dr. Kim also reported that Plaintiff is restricted in his ability to reach, push, and pull, and experiences postural and environmental limitations and restrictions. Id. Dr. Kim estimated that Plaintiff would need to miss work more than three times per month, and does not have the ability to pursue full-time employment. (AR 682.)

### 3. Treatment with Pain Care Center of San Diego

Plaintiff received physical therapy treatment from Dr. Danny Song of the Pain Care Center of San Diego beginning in May 2009. (See Exhibit 26F at AR 614-71.) In an evaluation dated May 14, 2009, Dr. Song noted that Plaintiff complained of centralized lower back pain and tension over the right hamstring and calf muscles, and that the pain is exacerbated through extended periods of walking, standing, bending, and lifting. (AR 618.) Dr. Song stated that his objective findings were consistent with Plaintiff's subjective complaints, and that Plaintiff exhibited palpable tenderness in

13cv1407

lower back muscles, marked limitations in spinal movements, and joint hypomobility.[16] Id.

On May 19, 2009, Michael Moon, M.D. provided a progress report on Plaintiff. (AR 298-99.) Dr. Moon explained that Plaintiff had received injections for his back pain which provided significant relief, but which amplified numbness in his right leg. (AR 298.) The report also noted the results from Plaintiff's 2007 MRI, which indicated that Plaintiff suffers from "multi-level degenerative disc disease with severe degeneration at L5-S1 and a central and right sided disc herniation at L4-S." Id. Dr. Moon noted that Plaintiff was in moderate discomfort, his gait was severely antalgic, he has lumbar paraspinal muscle spasms, and he exhibited a positive straight-leg raise test. Id.

A progress report dated August 26, 2009 indicated that Plaintiff exhibited a greater willingness to perform trunk movements. (AR 645.) However, Plaintiff was still suffering from joint hypomobility, and Plaintiff's lower extremity flexibility testing revealed significant tension of hip flexors and extensors. Id. Additionally, Plaintiff's slump and straight leg raising tests were negative. Id. These assessments were reiterated in a progress report dated February 22, 2011. (See AR 668.)

On August 25, 2011, Mary A. Ambach, M.D., completed a comprehensive pain management consultation for Plaintiff. (AR 713-17.) Dr. Ambach noted that Plaintiff's gait was stable and non antalgic. (AR 715.) Nevertheless, Dr. Ambach provided the following diagnoses for Plaintiff: (1) chronic low back pain; (2) lumbar degenerative disc disease and spondylosis; (3) lumbar radiculopathy; (4) left knee pain likely due to osteoarthritis; and (5) numbness and tingling with a burning sensation in the right foot. (AR 713, 716.)

On August 17, 2011, Dr. Song provided an opinion regarding Plaintiff's ability to do work-related activities. (Exhibit 28F at AR 676-79.) Dr. Song opined that Plaintiff

---

[16] Hypomobility refers to "a decrease in the normal movement of a joint or body part . . . ." Hypomobility, The Free Dictionary, http://medical-dictionary.thefreedictionary.com/hypomobility (last visited June 25, 2014).

could carry twenty pounds occasionally and ten pounds frequently, walk or stand for more than thirty minutes at a time and not more than two hours in an eight-hour workday, sit for more than thirty to forty-five minutes and not more than two hours in an eight-hour workday, and would be able to sit or stand for no more than thirty to forty-five minutes before needing to change positions. (AR 676-77.) Dr. Song also noted that Plaintiff would need to lie down at least two to three times daily. (AR 677.) Dr. Song opined that Plaintiff would be restricted from reaching, pushing, pulling, and climbing ladders, and should avoid concentrated exposure to extreme cold and hazardous environmental conditions. (AR 677-78.) Dr. Song ultimately opined that Plaintiff would miss work more than three days a month, and would not be suitable for full-time employment. (AR 678.)

### 4. MRI with Sharp and Children's MRI Center

On February 5, 2007, Plaintiff received a MRI of his lumbar spine at Sharp and Children's MRI Center. (AR 492.) The results of the MRI indicated that Plaintiff's spine alignment was normal, but at the L3-4 disc Plaintiff had mild degenerative changes with mild disc space narrowing. Id. At the L4-5 disc, Plaintiff was experiencing central and right-sided disc herniation, and there was moderate degenerative changes with some disc space narrowing. Id. Finally, the L5-S1 disc was found to be "severely degenerated with considerable disc space narrowing[] . . . [and] moderate disc bulging." Id.

### 5. Treatment with Jonathan M. Licht, M.D.

On July 27, 2010, Plaintiff saw Dr. Licht for a neurological consultation. (Exhibit 23F at AR 557-62.) Dr. Licht noted that Plaintiff exhibited zero reflexes in his lower extremities, subjective decrease in sensation in the right foot, and a somewhat antalgic gait. (AR 558.)

### 6. Treatment with Seagate Medical Group

13cv1407

On July 20, 2010, Plaintiff received a comprehensive psychiatric evaluation from Gregory M. Nicholson, M.D. (Exhibit 10F at AR 367-74.) Dr. Nicholson reported that Plaintiff has normal speech, intellectual functioning, and concentration, but suffers from a depressed and dysphoric mood. (AR 371.)

Dr. Nicholson diagnosed Plaintiff with a panic disorder and depressive disorder, not otherwise specified. (AR 372.) Dr. Nicholson opined that Plaintiff is not limited in his ability to follow instructions, and to perform work activities without special or additional supervision. (AR 373.) However, Dr. Nicholson stated that Plaintiff would face mild to moderate limitations in his ability to: (1) relate and interact with coworkers; (2) maintain concentration and attention, persistence, and pace; (3) associate with day-to-day work activity, including attendance and safety; and (4) maintain regular attendance and perform consistent work activities. Id. Dr. Nicholson also stated that Plaintiff appears capable of handling funds. Id.

### 7. Non-Examining Physician Dr. Brodsky

On July 8, 2010, State agency physician Dr. S. Brodsky completed a RFC Assessment. (AR 358-362.) Dr. Brodsky indicated that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently. (AR 359.) Dr. Brodsky also stated that Plaintiff is able to stand, walk, and sit for six hours in an eight-hour workday, and faces no limitations in his ability to push or pull. Id.

Dr. Brodsky opined that Plaintiff faces no manipulative, visual, environmental or communicative limitations. (AR 360-61.) Regarding postural limitations, Dr. Brodsky indicated that Plaintiff faces none, other than to avoid climbing ladders, ropes, and scaffolds. (AR 359-60.) Lastly, Dr. Brodsky noted that a treating or examining source statement regarding Plaintiff's physical capacities was not in the file. (AR 362.)

Also on July 8, 2010, Dr. Brodsky completed a Case Analysis with regard to Plaintiff's impairments. (AR 363-66.) Dr. Brodsky stated that Plaintiff's "[a]llegation of disability is considered partially credible [with regard] to [the] degree of sevety

alleged . . . ." (AR 365.) Dr. Brodsky ultimately opined that there is no contraindication to medium RFC performance. (AR 365.)

### 8. Non-Examining Physician Dr. Paxton

On July 26, 2010, State agency physician Dr. Paxton completed a Psychiatric Review Technique for Plaintiff. (AR 375-85.) Dr. Paxton indicated that Plaintiff suffers from an affective disorder (disturbance of mood, accompanied by a full or partial manic or depressive syndrome), but that the impairments are not severe. (AR 375, 377.) Dr. Paxton opined that the restriction to Plaintiff's activities of daily living is mild, but that Plaintiff faces no restrictions in maintaining social functioning, maintaining concentration, persistence, or pace, and experiences no episodes of decompensation. (AR 383.)

### IV.

### ALJ'S FINDINGS[17]

The ALJ made the following pertinent findings:

**1. [Plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2014.**

**2. [Plaintiff] has not engaged in substantial gainful activity since March 21, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*).**

**3. [Plaintiff] has the following severe impairments: low back, leg cramps and depression (20 CFR 404.1520(c)).**

Because these are medically determinable impairments that have lasted more than 12 months and cause more than a slight limitation of [Plaintiff's] physical or mental ability to do basic work activities, the Administrative Law Judge finds at step two of sequential disability analysis that the claimant's impairments are "severe" as defined in the Regulations.

**4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

Although the medical source statements indicated listing level severity, the medical evidence of record does not support these findings as discussed hereinbelow. Additionally, the medical expert testified that there is no objective medical evidence of record that has indicated objective medical findings that would satisfy the severity requirements

---

[17]/The ALJ's findings are found at AR 14-23.

for any listed impairment. Moreover, the state agency physicians have opined that [Plaintiff's] condition does not meet or equal any listing.

The severity of [Plaintiff's] mental impairment does not meet or medically equal the criteria of listing 12.04. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked restrictions in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, [Plaintiff] has moderate restriction. In social functioning, the claimant has moderate difficulties. With regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties. As for episodes of decompensation, [Plaintiff] has experienced no episodes of decompensation, which have been of extended duration. [Plaintiff] told Dr. Nicholson that he lives with his wife and he has no difficulty attending to his own personal hygiene without assistance. [Plaintiff] stated he is able to handle bills as well as handle cash appropriately and go out on his own independently. Because the plaintiff's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The limitations identified in the "paragraph B" criteria are not a residual functioning capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functioning capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in "paragraph B" of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**5. After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the residual functioning capacity to perform light work as defined in 20 CFR 404.1567(b) and due to [Plaintiff's] subjective pain complaints that limit his ability to function, the undersigned further finds that [Plaintiff] can lift and carry 20 pounds occasionally, 10 pounds frequently, sit for two hours at a time for a total of six hours in an eight-hour workday, stand for one hour at a time for a total of two hours in an eight-hour workday and walk for two hours for a total of four hours in an eight-hour workday with no restrictions in the use of the upper extremities, no**

13cv1407

**indication of decreased visual acuity, no communicative, hearing or environmental limitations, and due to symptoms of depression and medication side-effects, [Plaintiff] retains the mental residual functioning capacity to perform simple repetitive tasks with no public interaction and limited interaction with peers and supervisors.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering [Plaintiff's] symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)–i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques–that could reasonably be expected to produce [Plaintiff's] pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce [Plaintiff's] pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit [Plaintiff's] functioning. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of statements based on a consideration of the entire case record.

In January 2009, [Plaintiff] saw Robert Littman, M.D., for complaints of depression. [Plaintiff] was apathetic, but there was no suicidal ideation. [Plaintiff] complained of disrupted sleep, poor concentration, and no homicidal ideation. Dr. Littman diagnosed major depression and assigned a global assessment of functioning scale score of 40 (Exhibit 5F).

In June 2009, pertinent progress notes from Dr. Littman indicated that [Plaintiff] showed persistent depression and that [Plaintiff] stated he "hates the job" and "never wants to return" to his work as an autosalesman (Exhibit 5F).

[Plaintiff] reports a longitudinal history of low back pain and on November 30, 2009, Choll Kim, M.D., evaluated [Plaintiff] for complaints of disc degeneration, spondylosis, back pain and right greater than left leg pain. [Plaintiff] indicated that bending forward exacerbates the pain, and therapy, exercise, light walking, muscle relaxant, and anti-inflammatory medications as wells as a TENS unit all improve his pain. Physical therapy and injection therapy in the past were without significant improvement. Physical examination revealed that [Plaintiff's] gait was brisk with good coordination. There was normal lordosis with no tenderness at paraspinals with full range of motion on forward flexion

13cv1407

and extension. There were no paraspinal spasms. There was no tenderness over the sacroiliac joint or greater trochanter. There was normal swing during ambulation. Sensation to light touch was intact, and there was no atrophy and no deformity. Straight leg raising was negative bilaterally and motor strength was normal. Radiology studies revealed no scoliosis or spondylolisthesis, complete disc space collapse at L5-S1 with a steep sacral inclination and a vacuum disc as well as degenerative disc disease at L4-5 and L3-4. Dr. Kim recommended MRI study (Exhibits 3F and 25F).

MRI studies dated December 2009 of [Plaintiff's] lumbar spine showed normal alignment with multilevel degenerative disc disease. At L5-S1 there was moderate-to-severe bilateral neural foraminal stenosis based on a small disc bulge along with ligamentum flavum hypertrophy and facet arthropathy with additional levels of moderate neural foraminal stenosis (Exhibit 3F).

[Plaintiff] indicated that he sometimes uses a cane to ambulate, but no cane has been prescribed for [Plaintiff] by any treating physician. Moreover, the evidence of record shows that in October 2009 [Plaintiff] was frequently prescribed Viagra, 100 mg., and he has continued to routinely engage in ongoing sexual activity and requested STD testing on several follow up visits, including an HIV status check, all indications that his routine daily level of functioning is higher than alleged (Exhibits 4F and 22F).

In May 2012 [Plaintiff] underwent selective nerve root blocks at the L5-S1 level bilaterally and L5-S1 facet blocks bilaterally (Exhibit 6F).

On July 20, 2010, [Plaintiff] saw Gregory Nicholson, M.D., for a consultative psychiatric evaluation with complaints of depression due to the death of his brother. [Plaintiff's] mode was depressed and his affect was dysphoric, appropriate and congruent with thought content. Mental status examination revealed neurovegetative symptoms of depression. The remainder of the examination was unremarkable. Dr. Nicholson diagnosed a panic disorder and a depressive disorder, not otherwise specified and assigned a global assessment of functioning scale score of 60. Dr. Nicholson opined that the claimant retained the capacity to understand, remember, and carry out simple one or two-step job instructions as well as detailed and complex instructions. Dr. Nicholson stated that [Plaintiff] had moderate limitations in the ability to associate with day-to-day work activity and only mild limitation in most other areas of functioning (Exhibit 10F).

In August 2010, physical examination revealed that [Plaintiff's] gait was brisk with good coordination. Physical examination of the lumbar spine was within normal limits with full range of motion except some hamstring tightness. There was no tenderness over the sacroiliac joint or greater trochanter. The bilateral lower extremities showed no muscle atrophy, with full range of motion at the knees and ankles. Sensation was intact in the left lower extremity with some decreased sensation on the right. Straight leg raising was negative bilaterally, and motor strength and coordination was intact (Exhibit 15F).

13cv1407

In October 2010 [Plaintiff] experienced 30-40% improvement in pain with physical therapy. [Plaintiff's] gait was brisk with good coordination and he was able to rise from a laying position without any problems. [Plaintiff] was neurologically intact without any focal weakness. There was smooth and symmetric heel strike and toe lift-off.

Pertinent progress notes dated August 9, 2011, from Kim Choll, M.D., [sic] indicated that [Plaintiff] was "improving with nonoperative treatment." Progress notes indicated that [Plaintiff] saw Dr. Michael Keller of rheumatology on two occasions. [Plaintiff] was started on Cymbalta, Tylenol #3, Voltaren gel, Motrin, Flexeril and Neurontin. The record establishes that the "medication are helping." [Plaintiff] started physical therapy which was also helping. Overall [Plaintiff] was feeling better and motivated to continue an exercise program. Physical examination revealed that [Plaintiff's] gait was slightly more brisk, and he had multiple areas of tenderness to pressure. There was decreased sensation to light touch over the right foot with weakness of the extensor hallucis and gastrocsoleus. [Plaintiff] was encouraged to continue medication titration with Dr. Keller and continue physical therapy rehabilitation (Exhibit 31F).

Progress notes from Edwin M. Yorobe, M.D., dated August 10, 2011, indicated that [Plaintiff] reported that pain medications were helping, and that they made him sick. [Plaintiff's] medications included Neurontin, Codeine #3, Vicodin, Flexoril, Ibuprofen and Tylenol (Exhibit 33F).

John Axline, M.D., the medical expert, testified to his thorough review of the medical records and [Plaintiff's] testimony (Exhibits 1F through 34F). The medical expert testified that based on the evidence in the record, [Plaintiff's] impairments are severe impairments, but they do not meet or equal any criteria of any impairment set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A. Dr. Axline testified that [Plaintiff's] psychiatric impairment and hypertension were nonsevere. Based on the evidence of record, Dr. Axline testified that [Plaintiff] has disc degeneration with vacuum disc at L5-S1, and spondylosis at L3-5. Dr. Axline disagreed with the opinions of Dr. Yorobe at Exhibit 27F regarding the extreme limitations addressed therein and testified that there are no x-rays of record to support these findings. Dr. Axline testified that the evidence of record does not support the severity alleged, and there is no objective medical documentation for restrictions in reaching and fingering. The evidence record of record [sic] is inconsistent with the limitations set forth by Dr. Yorobe. The opinions of Dr. Kim regarding extreme limitations set forth therein are not supported by the objective evidence of record. The claimant has a longitudinal history of low back pain since 1995. In fact, Dr. Kim's own treating records showed that the physical examination was normal. There was no spasm, normal straight leg raising, decreased light touch and normal gait. Neurological evaluation was normal with subjective decreases in motor strength, in the right foot that does not interfere with function. Dr. Axline testified that in March 2006 [Plaintiff] was able to bend and physical examination was within normal limits. Dr. Axline testified that MRI study of [Plaintiff's] lumbar spine was also normal. Dr. Axline testified that the progress notes from Dr. Yorobe at 13F and Dr. Kim at 15F, revealed a physical examination within normal limits. [Plaintiff's] degenerative disc disease

after treatment does not meet or equal the criteria of any listing. There were no burns or specific injury to precipitate symptoms. Dr. Axline testified that [Plaintiff] does not have much side effect from pain medications. [Plaintiff's] medications seem well-tolerated, with Lyrica for restless leg syndrome, and [Plaintiff] is tolerant of muscle relaxant with no serious problems. Dr. Axline testified that Dr. Licht's findings in July 2010 (Exhibit 23F) revealed zero reflexes in the lower extremities, but there are no EMG studies to corroborate these findings, and radiculopathy was not confirmed by objective testing. Dr. Axline testified that he does not agree with the severity of the limitations set forth by Drs. Choll and Yorobe. In comparing the finding that there are no lower extremity reflexes with the findings at 13F where, at a similar time, reflexes were normal, confirms that these are subjective complaints that are not corroborated by objective clinical studies. Dr. Axline testified that a vacuum disc is not a solid disc and there is some defect in the disc indicating degenerative disc disease, and not known to be a source of pain. Dr. Axline stated that the evidence indicated that surgical intervention is not indicated as [Plaintiff] has degenerative disc disease at multiple levels and there is no objective evidence of neurological dysfunction. Reflex loss in not indicative of a problem and there is no spinal interference. The evidence establishes that EMG study of [Plaintiff's] right upper extremity was normal, and no evidence of radiculopathy was confirmed. Dr. Axline opined that [Plaintiff] can lift and carry 20 pounds occasionally, 10 pounds frequently, sit for two hours at a time for a total of six hours in an eight-hour workday, stand for one hour at a time for a total of two hours in an eight-hour workday and walk for two hours for a total of four hours in an eight hour workday with no restrictions in the use of the upper extremities, no indication of decreased visual acuity, no communicative, hearing or environmental limitations.

Social Security Ruling 96-6p requires that the opinions of State Agency medical consultants be considered in deciding the claim now before the undersigned. Such opinions are those of non-examining, non-treating medical sources and can be given weight insofar as they are well supported by evidence in the case record as a whole. Such a finding would require that the State Agency physician make a well-explained rationale for his or her findings and opinions. For the instant claim, the State Agency consultants determined that the claimant could perform a medium level of work activity with no severe mental impairment (Exhibits 8F and 11F). Although the undersigned finds [Plaintiff] somewhat more limited, the opinions of the State Agency consultants are generally consistent with the objective evidence of record for the period at issue.

After careful consideration of the evidence, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

In terms of [Plaintiff's] alleged impairments, [Plaintiff] told Dr. Nicholson that he lives with his wife, he has no difficulty attending to his

own personal hygiene without assistance as well as prepare light meals for himself. [Plaintiff] stated he is able to handle bills as well as handle cash appropriately and go out on his own independently. [Plaintiff] indicated that he sometimes uses a cane to ambulate. However, there is no medical evidence to support a medical necessity that he requires the use of a cane. Moreover, the evidence of record shows that in October 2009 [Plaintiff] was prescribed Viagra, 100 mg. And progress notes established that [Plaintiff] was sexually active, indicating a much higher level of functioning than that alleged by [Plaintiff] (Exhibit 4F, p. 4). Progress notes indicated the [Plaintiff] was minimally restricted in backward bending and bilateral rotation. [Plaintiff] was "showing signs of continuing progress" and [Plaintiff] was "independent with . . . symptom management" (Exhibit 18F). [Plaintiff] testified that he is receiving disability benefits in the amount of $5,000 per month from Fidelity Insurance Company which will end in March 2015. The undersigned finds that [Plaintiff's] current disability income provides incentive to exaggerate his limitations in order to continue receiving disability payments. [Plaintiff's] statements concerning the intensity, persistence and limiting effects of the alleged symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. Moreover, [Plaintiff's] routine activities establish a level of functioning greater than alleged. On March 26, 2004, [Plaintiff] reported he hurt his back playing billiards and wanted a referral to the chiropractor (Exhibit 22F). On October 7, 2004, [Plaintiff] requested to be checked after recent sexual activity and the record indicated that this activity was ongoing (Exhibit 22F, pp. 3-4). The record also establishes that in August 2005, progress notes establish that [Plaintiff] was "going on a trip where malaria" was epidemic which would require the ability to sit for a longer period than that alleged by [Plaintiff]. Consequently, the undersigned finds that [Plaintiff's] allegations of disabling pain and limitation are inconsistent with the evidence of record and are, therefore, not fully credible.

As for the opinion evidence, for the following reasons, the undersigned rejects assessments in the medical source statements of Dr. Kim and Dr. Yorobe (Exhibit 27F and 29F).

Dr. Kim and Dr. Yorobe both impose severe restrictions on [Plaintiff's] functional capacity and limit [Plaintiff] to lifting 10 pounds, standing/walking less than two hours in an eight hour workday and sitting less than two hours in an eight hour workday due to back and leg pain, as well as needing to lie down during work and shift at will from standing/sitting/walking. Both doctors also impose postural limitations as well as restrictions pushing/pulling and reaching overhead and indicated that [Plaintiff] would be absent from work more that three times per month due to impairments or treatment. With regard to these extreme limitations set forth by both Dr. Kim and Dr. Yorobe, the medical expert testified that there are no x-ray studies to support these findings, and there is no objective medical documentation for restrictions in reaching. The medical expert also testified that when comparing the findings of record that there were no lower extremity reflexes with the findings at Exhibit 13F where, at a similar time, reflexes were normal, the evidence of record does not support the assessment of decreased neurological functioning as there is no EMG study to corroborate these findings.

[Plaintiff] reported medication side effects from pain relief medications, but the medical expert testified that [Plaintiff's] medications have no side-effects except possibly gastrointestinal, and no effects on mental functioning. [Plaintiff's] medications seem well-tolerated, with Lyrica for restless leg syndrome, and [Plaintiff] is tolerant of muscle relaxants with no serious problems.

Pertinent progress notes dated August 9, 2011, from Choll Kim, M.D., indicated that [Plaintiff] was "improving with nonoperative treatment" (Exhibit 31F). Dr. Kim's physical examination on November 30, 2009, showed [Plaintiff's] gait was brisk with good coordination and normal station in the sagittal and coronal planes. There was normal lordosis, no tenderness at paraspinals and range of motion was full on forward flexion and extension. There was normal tone without paraspinal spasms (Exhibit 3F). Dr. Kim's own treating records showed that the physical examination was normal. There was no spasm, normal straight leg raising, decreased light touch and normal gait. Neurological evaluation was normal with subjective decreases in motor strength in the right foot that does not interfere with function. In March 2006, [Plaintiff] was able to bend and physical examinations within normal limits at Exhibit 13F and at Exhibit 15F. Dr. Licht's findings in July 2010 (Exhibit 23F) indicating zero reflexes in the lower extremities are not supported by EMG studies to corroborate these findings, and radiculopathy was not confirmed by objective testing.

Progress notes establish the [Plaintiff] was sexually active and requested Viagra, which was prescribed for him. . . . On March 26, 2004, [Plaintiff] reported he hurt his back playing billiards and wanted a referral to the chiropractor (Exhibit 22F). The record also establishes that in August 2005, progress notes establish that [Plaintiff] was "going on a trip where malaria" was epidemic which would require the ability to sit for longer than the limit alleged by [Plaintiff]. Consequently, the undersigned rejects the conclusions of extreme limitation set forth by Drs. Yorobe and Kim as they are not supported by objective medical evidence of record and they are not supported by these physicians' own progress and treating records (Exhibits 27F, 28F, 29F, and 30F).

...

In sum, the above residual functioning capacity assessment is supported by the medical expert, the opinions of State Agency consultants, the opinions of the consultative examiner and the objective medical evidence of record.

**6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).**

[Plaintiff] has past relevant work experience as a [sic] auto salesperson (DOT #273.353-010) skilled, light level work activity (Exhibit 11E). [Plaintiff] is limited to light work involving simple repetitive tasks. Accordingly, [Plaintiff] is unable to perform past relevant work.

28

13cv1407

**7. [Plaintiff] was born on May 10, 1962 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).**

**8. [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).**

**9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports finding that [Plaintiff] is "not disabled," whether or not [Plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).**

**10. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform (20 CFR 404.1569(a)).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider [Plaintiff's] residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If [Plaintiff] can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon [Plaintiff's] specific vocational profile (SSR 83-11). When [Plaintiff] cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If [Plaintiff] has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking.

If [Plaintiff] had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, [Plaintiff's] ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and residual functional capacity. The vocational expert testified that of the 1600 [sic] light and sedentary job titles in the grid, erosion is 40%, and given all of these factors the individual would be able to perform the requirements of representative occupations such as: inventory clerk (DOT 209.367-054) unskilled, light level work, 1,900/29,000; cleaner (DOT #323.687-014) unskilled, light level work, 1,400/78,000; and sealer (DOT #$559-687-014) 1,200/100,000.

13cv1407

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from March 21, 2009, through the date of this decision (20 CFR 404.1520(g)).**

## V.

## STANDARD OF REVIEW

A District Court may only disturb the Commissioner's final decision "if it is based on legal error or if the fact findings are not supported by substantial evidence." Sprague v. Bowen, 812 F.2d 1226, 1229 (9th Cir. 1987); see Villa v. Heckler, 797 F.2d 794, 796 (9th Cir. 1986).  The Court cannot affirm the Commissioner's final decision simply by isolating a certain amount of supporting evidence. Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990).  Rather, the Court must examine the administrative record as a whole.  Id.  Yet, the Commissioner's findings are not subject to reversal because substantial evidence exists in the record to support a different conclusion. See, e.g., Mullen v. Brown, 800 F.2d 535, 545 (6th Cir. 1986).  "Substantial evidence, considering the entire record, is relevant evidence which a reasonable person might accept as adequate to support a conclusion." Matthews v. Shalala, 10 F.3d 678, 679 (9th Cir. 1993).  The Commissioner's decision must be set aside, even if supported by substantial evidence, if improper legal standards were applied in reaching that decision. See, e.g., Benitez v. Califano, 573 F.2d 653, 655 (9th Cir. 1978).

## VI.

## ANALYSIS

13cv1407

Plaintiff's Motion for Summary Judgment raises three issues: (1) whether the ALJ committed reversible error by rejecting the opinions of Plaintiff's treating providers; (2) whether the ALJ's adverse credibility finding is supported by substantial evidence; and (3) whether the ALJ erred by failing to properly analyze whether Plaintiff met or equaled listing 1.04(A). (Doc. No. 11-1 at 4, 7, 8).

### A. THE ALJ HAS NOT PROVIDED SPECIFIC AND LEGITIMATE REASONS FOR REFUSING TO AFFORD CONTROLLING WEIGHT TO PLAINTIFF'S TREATING PHYSICIANS' OPINIONS, AND HAS ERRED IN FAILING TO CONSIDER PLAINTIFF'S POSITIVE STRAIGHT-LEG RAISE TEST

Plaintiff argues that the "ALJ committed reversible error in not affording controlling weight to [P]laintiff's treating physicians." (Doc. No. 11-1 at 4.) Additionally, Plaintiff argues that the testifying medical expert misinterpreted the MRIs, that the reasons given by the ALJ for rejecting the opinions of Plaintiff's treating physicians are not legitimate, and that the ALJ failed to consider objective evidence supporting Plaintiff's claims of disability severity. (Doc. No. 11-1 at 5, 6, 7.)

Defendant argues that "[b]ecause the ALJ cited inconsistencies between [Plaintiff's treating physicians'] opinions and their treating records and other evidence, the ALJ was not required to give controlling weight to these opinions, and permissibly preferred the testimony of [the medical expert]." (Doc. No. 13-1 at 13.)

### 1. Applicable Law

The opinions of treating physicians are generally entitled to greater weight than the opinions of examining and non-examining physicians. See 20 C.F.R. § 404.1502; see also Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). The ALJ may reject the treating physician's opinion in favor of another physician's opinion if the evidence in the record supports the alternative conclusion. See Orn, 495 F.3d at 632. When a treating physician's opinion conflicts with another doctor's opinion, the ALJ must provide only "specific and legitimate" reasons for discounting the treating doctor's opinion. Dominguez v. Colvin, 927

F.Supp.2d 846, 858 (C.D. Cal. 2013) (citing <u>Orn</u>, 495 F.3d at 632). The ALJ may discredit a treating physician's opinion if it is inconsistent with other substantial evidence in the record or is not well-supported by medically accepted clinical and laboratory diagnostic techniques. <u>Orn</u>, 495 F.3d at 631-32.

The ALJ may satisfy the requirement of providing specific and legitimate reasons by "setting out a detailed and thorough summary of facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Tomasetti v. Astrue</u>, 533 F.3d 1035, 1041 (9th Cir. 2008) [citing <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)]. The ALJ must not only offer his own conclusions, he must also explain why his interpretations are correct. <u>Orn</u>, 495 F.3d at 631 [citing <u>Embrey v. Bowen</u>, 849 F.2d 418, 421-22 (9th Cir. 1988)].

## 2. <u>Discussion</u>

In determining Plaintiff's RFC for light work, the Court finds that the ALJ has not provided specific and legitimate reasons for rejecting Plaintiff's treating physicians' opinions, and that there is not substantial evidence to support the ALJ's reasons. <u>Gonzalez</u>, 914 F.2d at 1200. The Court also finds that the ALJ neglected to comment on Plaintiff's positive straight-leg raise test, and remands the case for clarification on this issue.

### i. <u>Insubstantial Evidence to Discredit Plaintiff's Treating Physicians</u>

Here, the ALJ's opinion was contradictory to those of Plaintiff's treating physicians, and concurred with that of medical expert John Axline, M.D. The ALJ provided copious justifications for this determination. Moreover, the ALJ cited many of Plaintiff's treating physicians' own records, of which the medical expert had referenced during his testimony. (<u>See</u> AR 50, 53.) However, the ALJ glossed over the notes submitted by Dr. Yorobe, one of Plaintiff's treating physicians. (<u>See</u> AR 18.)

The ALJ referred to progress notes from Dr. Kim dated November 30, 2009 (Exhibit 25F at 604), indicating that Plaintiff exhibited no tenderness over the sacroiliac

joint, normal swing during ambulation with no marked antalgia, intact sensation to light touch with no atrophy or deformity, and full range of motion on forward flexion and extension. (AR 16.) Further, these progress notes, as indicated by the ALJ, showed that radiology studies revealed no scoliosis or spondylolisthesis, and that straight leg raising was negative bilaterally with normal motor strength. Id. The ALJ cited additional progress notes from Dr. Kim dated August, 2010, wherein Plaintiff was noted to have a brisk gait with good coordination, full range of motion of the lumbar spine (with the exception of some hamstring tightness), no tenderness over the sacroiliac joint or greater trochanter, full range of motion in the lower extremities with no exhibited tenderness, negative bilateral straight leg raising, and intact coordination and motor strength. (AR 17.)

The ALJ also referred to notes from Plaintiff's psychiatric evaluation with Gregory Nicholson, M.D. dated July 20, 2010 (Exhibit 10F at 373) wherein Plaintiff was evaluated to have the ability to "understand, remember, and carry out simple one or two-step instructions as well as detailed and complex instructions." (AR 17.) This reference substantiates Plaintiff's cognitive capacity to engage in SGA.

The above-referenced evidence was thoroughly discussed and discredited by the medical expert, Dr. Axline, who testified that while Plaintiff's impairments are severe, he did not concur with the extreme limitations prescribed for Plaintiff by Plaintiff's treating physicians, and that the limitations are not supported by objective evidence in the record. (See AR 18.) For example, the medical expert explained that there were no x-rays of record to support the findings of Plaintiff's treating physicians. Id. While Dr. Kim referred to x-rays taken of Plaintiff's spine in his progress notes (AR 267), these x-rays were not included in the administrative record. Additionally, Dr. Axline indicated that no objective medical evidence existed in the record evidencing Plaintiff's prescribed restrictions in fingering and reaching. (AR 18.) The ALJ ultimately adopted the opinion of Dr. Axline. (See AR 15, 19.)

13cv1407

Nevertheless, the ALJ made sparse references to Plaintiff's treating physician Dr. Yorobe's records. (See AR 14-23.) The entirety of the ALJ's discussion on Dr. Yorobe's medical progress records is as follows:

> Progress notes from Edwin M. Yorobe, M.D., dated August 10, 2011, indicated that [Plaintiff] reported that pain medications were helping, and that they made him sick. [Plaintiff's] medications included Neurontin, Codeine #3, Vicodin, Flexoril, Ibuprofen and Tylenol (Exhibit 33F).

(AR 18.)

Beyond that, the ALJ merely reiterates Dr. Axline's conclusion that there is no objective medical evidence in the record to support Dr. Yorobe's opinions. (See AR 18, 20, 21.)  The Court recognizes that Dr. Yorobe served as Plaintiff's primary care physician, and is not a specialist in the field of spinal injuries and impairments. (AR 50.) The Court also recognizes that the medical records from Dr. Yorobe are largely illegible. (See Exhibit 4F at AR 277-80, Exhibit 13F at AR 396, Exhibit 22F at AR 493-509, & Exhibit 33F at AR 724.) Nonetheless, the Court finds that the ALJ had a duty to discuss Dr. Yorobe's findings and to provide substantial evidence to discredit it, and that duty was neglected. "An ALJ's 'lack of explanation' for failing to address a treating physician's opinion is 'particularly troublesome' when that physician was the claimant's 'longtime treating physician.'" Farris v. Coleman, 2014 WL 1364524 at *5 (N.D. Ala. 2013) (citing Ryan v. Heckler, 762 F.2d 939, 942 (11th Cir. 1997).) In Farris, the court also noted that the claimant's treating physician's notes were largely illegible. Farris, 2014 WL 1364524 at *3, 4. However, the court nevertheless found that "[a]bsent some explanation from the ALJ why these treatment records were not considered, or were considered but rejected, the court cannot find that the ALJ has properly decided the plaintiff's claim on the basis of all the evidence." Id. at *4. This Court agrees that it was an abuse of the ALJ's discretion to merely gloss over the evidence submitted by one of Plaintiff's treating physicians. While the notes from Dr. Yorobe may have been largely illegible, the ALJ should have made greater efforts to decipher the notes, or requested they be submitted in a legible format. Without a more

robust discussion on Dr. Yorobe's notes and findings, the Court finds that the ALJ committed error in this regard.

Thus, while the ALJ's ultimate opinion refuted those of Plaintiff's treating physicians, and adopted that of Dr. Axline, the ALJ based that opinion on evidence which was derived from Plaintiff's own treating physicians, and from Dr. Axline's testimony which identified inconsistencies between the treating physicians' opinions and their medical records. However, the ALJ failed to consider the evidence submitted by Dr. Yorobe, Plaintiff's treating physician. The ALJ failed to rely on substantial evidence in the record when discrediting Dr. Yorobe, nor did he provide specific and legitimate reasons for doing so. Accordingly, the ALJ erred when affording controlling weight to Dr. Axline, rather than Plaintiff's treating physicians' opinions, regarding Plaintiff's ability to work.

### ii. Alleged Misinterpretation of Plaintiff's MRIs

Plaintiff also argues that Dr. Axline misinterpreted or ignored the records regarding Plaintiff's 2007 and 2009 MRIs, so the ALJ committed error by relying on his opinion. (Doc. No. 11-1 at 5.) Specifically, Plaintiff explains that Dr. Axline testified that the 2007 MRI showed that Plaintiff exhibited a herniation at the L4-5 disc, and a moderate bulge at L5-S1, with clear foramina ("[i]n other words the nerve exiting openings were clear at all levels." (AR 52.)) (Doc. No. 11-1 at 5.) Then, Plaintiff explains that Dr. Axline testified that at "L4-5 there's only a small bulge so the herniation described in '07, has cleared by '09, and there has been no surgery." (AR 52) (Doc. No. 11-1 at 5.) Plaintiff argues that Dr. Axline misread the 2009 MRI, and that the 2009 MRI actually revealed that the disc bulge at L4-5 "results in moderate bilateral neural foraminal stenosis . . . ." (AR 269) (Doc. No. 11-1 at 5.) Ultimately, Plaintiff uses this discrepancy as ammunition to support his claim that the ALJ should not have relied on Dr. Axline's opinions regarding Plaintiff's disability severity. (Doc. No. 11-1.)

Plaintiff's argument fails. As a layperson, Plaintiff is not qualified to interpret medical evidence. Plaintiff fails to cite to any opinion of Plaintiff's treating physicians in the administrative record that demonstrates Dr. Axline's alleged misinterpretation of the 2009 MRI. Further, Plaintiff cites no legal authority pertaining to his claim that the ALJ erred when relying on Dr. Axline's opinions, rather than the opinions of Plaintiff's treating physicians, regarding the alleged misinterpretation of Plaintiff's MRI. (See Doc. No. 11-1 at 5-6.) This is not a proper basis for rejecting the entirety of Dr. Axline's testimony. The ALJ was within his sound discretion in affording more weight to Dr. Axline's testimony over those of Plaintiff's treating physicians, so long as Dr. Axline's opinion is supported by substantial evidence in the record. Lester v. Chater, 81 F.3d 821, 831 (9th Cir. 1995) (explaining that the opinion of a treating physician may be discredited in favor of the opinion of a nonexamining physician when the latter is supported by substantial evidence in the record). As demonstrated above, Dr. Axline's opinion was supported by such substantial evidence in the administrative record. (See supra, Part VI.2.i.)

### iii. Illegitimate Reasons for Discrediting Plaintiff's Treating Physicians

Next, Plaintiff argues that the ALJ erred when rejecting the opinions of Plaintiff's treating physicians in part based on illegitimate reasons, including: "(1) progress notes indicat[ing Plaintiff] was sexually active and requested Viagra; (2) progress notes from 2005 indicat[ing P]laintiff was going on a trip where malaria was epidemic; and (3) [P]laintiff reported on March 26, 2004 that he hurt his back playing billiards." (Doc. No. 11-1 at 6.) Plaintiff argues that these reasons are invalid because Plaintiff's alleged disability onset date is March 21, 2009, that these medical records predate this by more than three years, and thus are not relevant. Id. Plaintiff further argues that the ALJ "had the opportunity to ask [P]laintiff at the hearing how his spinal impairment impacted his sex life. The ALJ chose not to so [sic] and it was disingenuous to use that as a basis to deny benefits." (Doc. No. 11-1 at 7.)

Defendant concedes that the malaria and billiards issues "occurred prior to Plaintiff's alleged onset date and are therefore not probative." (Doc No. 13-1 at 15.) However, Defendant noted that Plaintiff's continued reception of Viagra prescriptions post-dates the alleged disability onset date, and argued that this fact reasonably infers that Plaintiff's physical capabilities are greater than alleged. (Doc. No. 13-1 at 16.)

Ninth Circuit courts have held that "[o]ne does not need to be 'utterly incapacitated' in order to be disabled." Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) [citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)]. However, the determination of whether the ALJ was within his discretion in affording more weight to a nonexamining medical expert than one's treating physicians rests on whether the ALJ relied on substantial evidence in the record, and had legitimate and specific reasons for doing so. Lester, 81 F.3d at 831. The Court agrees with Plaintiff that a continued prescription of Viagra is an illegitimate reason for discrediting Plaintiff's treating physicians. Likewise, the ALJ's use of Plaintiff's requests to receive testing for sexually transmitted diseases ("STD") is not a justification for discrediting Plaintiff's treating physicians. (See AR 17.) When using Plaintiff's sex life as evidence that Plaintiff's daily level of functioning is greater than that alleged, the ALJ cites to Exhibits 4F and 22F in the administrative record. (AR17.) However, within those Exhibits (which are progress notes produced by Dr. Yorobe), there are only three mentions of issuing a Viagra prescription. The first prescription was issued on May 9, 2005–nearly four years prior to Plaintiff's alleged disability onset date. (AR 494.) Because this prescription was issued before the alleged disability onset date, it was improper for the ALJ to use this evidence to discredit Plaintiff's treating physicians. The second prescription was issued on October 1, 2009, and Dr. Yorobe prescribed seven doses with ten refills. (AR 279, 507.) The final prescription was issued on April 14, 2010, which contained 6 doses with no indications of any refills. (AR 280, 509.) Likewise, there are three mentions of Plaintiff's request for STD testing within those Exhibits. The first occurred on October

7, 2004 (AR 493), the second on May 9, 2005 (AR 494), and the third on October 9, 2007 (AR 501.) Again, all of these dates predate Plaintiff's alleged disability onset date by years, and are thus invalid justifications for discrediting Plaintiff's treating physicians. By simply doing the math, one might assume that Plaintiff engaged in sexual activity about 76 times (seven doses with ten refills equal 70, plus six doses with no refills equal a total of 76 doses) in roughly a six to seven month time frame (October 1, 2009 to April/May 2010)(if Plaintiff used the Viagra before every sexual encounter). But there is no evidence of this in the record. No where in the ALJ's opinion, nor in the administrative record, is there evidence or any mention of the degree of frequency or vigor of Plaintiff's sexual activity. Without such evidence, the Court does not find that Plaintiff's reception of Viagra prescriptions, or requests for STD testing, demonstrate a greater level of functioning than alleged.

### iv. <u>ALJ's Failure to Consider Positive Straight-Leg Raise Test</u>

Finally, Plaintiff argues that the ALJ erred in relying on Dr. Axline's interpretation of Dr. Licht's neurological examination: "[Dr. Axline] claimed the examination showed normal findings but then conceded at the hearing that the report actually indicated zero reflexes in the lower extremities. The ALJ found that the zero reflexes were not material because they were not supported by objective testing [in the form of EMG studies]." (Doc. No. 11-1 at 7) (citation omitted). Plaintiff contends that while an EMG was not performed, there was objective evidence in the form of a positive straight-leg test taken on May 19, 2009. (<u>Id</u>.; <u>see</u> AR 550.) Defendant counters by explaining that "[a] positive straight-leg test . . . indicates possible disc herniation. It does not necessarily relate to reflexes in the foot. Indeed, Dr. Axline testified that the assessment of zero reflexes in the foot was not supported by clinical evidence[] . . . ." (Doc. No. 13-1 at 16.) Defendant also noted that the positive result in the straight leg test occurred only once throughout the multitude of straight-leg tests performed with Plaintiff, which were all negative. (<u>Id</u>. at 17; <u>see</u> AR 252, 273, 405, 668.)

13cv1407

The ALJ's opinion failed to consider the positive result on Plaintiff's straight-leg raise test. While the ALJ may have decided that this piece of evidence was inconsequential in consideration of the multitude of other negative results on Plaintiff's straight-leg raise tests, it is improper for this Court to conjecture as such. "Long-standing principles of administrative law require [courts] to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ–not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009). It is beyond the province of this Court to guess as to what the ALJ's reasoning may have been when neglecting to comment on the positive straight-leg raise test result. The ALJ had a duty to consider this piece of evidence, and failed to do so.

For the reasons above, the Court finds that the ALJ has not provided substantial evidence supporting his decision to assign greater weight to the medical expert than Plaintiff's treating physicians, that the ALJ did not misinterpret Plaintiff's MRIs, and that the ALJ's reasons for discrediting Plaintiff's treating physicians are invalid. The Court also finds that the ALJ had a duty to comment on Plaintiff's positive straight-leg raise test, which was neglected. Accordingly, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED, Defendant's Cross-Motion for Summary Judgment be DENIED, and the ALJ, upon remand, be required to evaluate Dr. Yorobe's progress notes, and address the issue of whether the positive straight-leg raise test authenticates Plaintiff's alleged severity of his alleged disability.

## B. THE ALJ'S ADVERSE CREDIBILITY FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Plaintiff argues that the ALJ's adverse credibility finding as to Plaintiff's testimony is not supported by substantial evidence. (Doc. No. 11-1 at 7.) Specifically, Plaintiff argues that "[t]he ALJ found that [P]laintiff had verifiable impairments and was required to provide clear and convincing reasons in support of his adverse credibility finding." Id. Moreover, Plaintiff contends that the ALJ did not evaluate how

13cv1407

Plaintiff's ability to perform daily, relatively mundane tasks discounts Plaintiff's testimony regarding the severity of his disability. (Doc. No. 14 at 4.)

Defendant argues that the ALJ permissibly evaluated Plaintiff's testimony. (Doc. No. 13-1 at 17.) Specifically, Defendant argues that the ALJ's finding that Plaintiff's testimony was inconsistent with the record as analyzed by the medical expert was valid. (Doc. No. 13-1 at 19.)

## 1. **Applicable Law**

Congress expressly prohibits granting disability benefits based on subjective complaints. 42 U.S.C. § 423(d)(5)A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability . . . ."); 20 C.F.R. § 404.1529(a) (An ALJ will consider a claimant's statements about pain or other symptoms but they will not alone establish disability.) An ALJ cannot be required to believe every allegation of disability, or else disability benefits would be available for the taking, which would be contrary to the Act. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

In determining the credibility of a Plaintiff's testimony regarding subjective pain, the Ninth Circuit has established a two-step analysis for the ALJ. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009). "First, the ALJ must determine whether the [Plaintiff] has presented objective medical evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged." Vasquez, 575 F.3d at 591. Second, if the plaintiff meets the first step and there is no evidence of malingering, the ALJ can reject the plaintiff's testimony only if the ALJ provides "specific, clear, and convincing reasons." Id.

"In order for the ALJ to find [the plaintiff's] testimony unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [the plaintiff's] testimony." Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting Thomas

13cv1407

v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002)). "[T]he [ALJ] may not discredit [the plaintiff's] testimony of pain and deny disability benefits solely because the degree of pain alleged by the [plaintiff] is not supported by objective medical evidence." Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991). An ALJ may consider a variety of credibility factors, including ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; the claimant's daily activities; nature, location, onset, duration, frequency, radiation, and intensity of pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of any medication; treatment, other than medication; functional restrictions; and unexplained, or inadequately explained, failure to seek treatment or to follow a prescribed course of treatment. Id.; Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see Orn, 495 F.3d at 637-39. If the ALJ's finding is supported by substantial evidence, it is not the court's role to second guess it. Thomas, 278 F.3d at 959; Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

## 2. Discussion

Here, the ALJ found that "the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms[.]" (AR 19.) However, the ALJ found Plaintiff's testimony not credible concerning the intensity, persistence, and limiting effects of his symptoms because they were inconsistent with the residual functional capacity assessment. Id. Since the first step of this analysis is satisfied, as determined by the ALJ, the only remaining issue is whether the ALJ provided specific, clear, and convincing reasons for discrediting Plaintiff's testimony. Vasquez, 572 F.3d at 591.

The ALJ set forth the following reasons for finding Plaintiff's testimony not credible:

> In terms of [Plaintiff's] alleged impairments, [Plaintiff] told Dr. Nicholson that he lives with his wife, he has no difficulty attending to his

own personal hygiene without assistance as well as prepare light meals for himself. [Plaintiff] stated he is able to handle bills as well as handle cash appropriately and go out on his own independently. [Plaintiff] indicated that he sometimes uses a cane to ambulate. However, there is no medical evidence to support a medical necessity that he requires the use of a cane. Moreover, the evidence of record shows that in October 2009 [Plaintiff] was prescribed Viagra, 100 mg. And progress notes established that [Plaintiff] was sexually active, indicating a much higher level of functioning than that alleged by [Plaintiff] (Exhibit 4F, p. 4). Progress notes indicated the [Plaintiff] was minimally restricted in backward bending and bilateral rotation. [Plaintiff] was "showing signs of continuing progress" and [Plaintiff] was "independent with . . . symptom management" (Exhibit 18F). [Plaintiff] testified that he is receiving disability benefits in the amount of $5,000 per month from Fidelity Insurance Company which will end in March 2015. The undersigned finds that [Plaintiff's] current disability income provides incentive to exaggerate his limitations in order to continue receiving disability payments. [Plaintiff's] statements concerning the intensity, persistence and limiting effects of the alleged symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. Moreover, [Plaintiff's] routine activities establish a level of functioning greater than alleged. On March 26, 2004, [Plaintiff] reported he hurt his back playing billiards and wanted a referral to the chiropractor (Exhibit 22F). On October 7, 2004, [Plaintiff] requested to be checked after recent sexual activity and the record indicated that this activity was ongoing (Exhibit 22F, pp. 3-4). The record also establishes that in August 2005, progress notes establish that [Plaintiff] was "going on a trip where malaria" was epidemic which would require the ability to sit for a longer period than that alleged by [Plaintiff]. Consequently, the undersigned finds that [Plaintiff's] allegations of disabling pain and limitation are inconsistent with the evidence of record and are, therefore, not fully credible.

(AR 19-20.)

The Court finds that the ALJ's rejection of Plaintiff's complaints based on his daily activities is not supported by substantial evidence. The ALJ appears to rely on portions of Plaintiff's testimony at the hearing, the Adult Function Report completed by Plaintiff (AR 209-16), as well pertinent notes from Plaintiff's treating physicians. In Plaintiff's Adult Function Report, Plaintiff reported that he rarely prepares any food for himself, except sometimes a cup of tea. (AR 211.) Additionally, Plaintiff testified at the hearing that at most, he is able to prepare a cheese sandwich for himself, as it does not involve standing for more than a few minutes. (AR 44.) Moreover, while Plaintiff is able to independently leave his abode, he is only capable of driving roughly ten to twenty minutes (AR 212), and only once every three days. (AR 42.) There is no

13cv1407

evidence in the record that Plaintiff daily performs any of the activities cited by the ALJ. Furthermore, the progress notes cited by the ALJ indicating that Plaintiff was "showing signs of continuing progress" and that Plaintiff was "independent with . . . symptom management" are dated April 26, 2006, roughly three years prior to the alleged onset date of Plaintiff's disability. (See Exhibit 18F at AR 472.)

More importantly, in order to discredit Plaintiff's complaints based on evidence of daily activities, the ALJ must find that Plaintiff is able to spend a substantial part of the day engaged in pursuits that involve physical functions that are transferable to a work setting. Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990); see also Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (concluding that adverse credibility findings based on activities may be proper "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace"). The only activity in which Plaintiff engages that was referenced by the ALJ that may be transferable to a workplace setting is "handl[ing] bills and handl[ing] cash appropriately." However, Plaintiff explains that he only pays bills online, does not have much savings to handle, and simply does not need to deal with financial issues. (AR 212.) Furthermore, "reading [and] watching television . . . are activities that are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace." Orn, 495 F.3d at 639. Here, Plaintiff testified that he needs to lie down and rest for an hour five to six times daily (AR 43), and spends the vast majority of the remaining time reading or watching television. (AR 209.) Ultimately, the ALJ has failed to demonstrate how these activities could be transferred to the workplace. There is neither evidence in the record to support that Plaintiff's activities are "transferable" to a work setting, nor proof that Plaintiff spends a "substantial" part of his day engaged in transferable skills. The Court finds that the reasons given by the ALJ are not valid to support the ALJ's adverse credibility determination.

13cv1407

Next, the ALJ asserts that Plaintiff's "routine activities establish a level of functioning greater than that alleged." (AR 19.) Specifically, the ALJ mentions Plaintiff's back injury sustained while playing billiards in 2004, and Plaintiff's trip to an area where malaria was epidemic, as activities which undermine Plaintiff's disability severity claims. (AR 19-20.) However, these activities were performed years prior to Plaintiff's alleged disability onset date (March 21, 2009), and the ALJ provides no evidence showing that Plaintiff engages in these activities in an ongoing manner. Further, the ALJ references Plaintiff's continued active sex life as an indication that Plaintiff's disabling pain and limitation are less severe than alleged. (AR 20.) The ALJ made no effort to demonstrate how this conclusion is reached, and did not bother making inquiries into this issue at Plaintiff's hearing. Again, there is no evidence in the record nor mention in the ALJ's opinion of the degree of vigor and frequency of Plaintiff's sex life. The fact that Plaintiff was prescribed Viagra and was tested for STDs does not necessarily indicate that Plaintiff's sex life was so active and vigorous that his disability is not as severe as alleged. Without such clarification, the Court does not find that, or the other reasons specified by the ALJ, as legitimate reasons that support the ALJ's adverse credibility finding.

In sum, the Court finds that the ALJ's listed reasons do not sufficiently address why Plaintiff's testimony regarding his impairment is not credible. The Court RECOMMENDS that Plaintiff's Motion for Summary Judgment on this issue be GRANTED, Defendant's Cross-Motion for Summary Judgment be DENIED, and the ALJ, upon remand, be required to reconsider Plaintiff's credibility.

## C. THE ALJ ERRED IN FAILING TO ANALYZE WHETHER PLAINTIFF MET OR EQUALED LISTING 1.04(A)

Plaintiff argues that the Listing at 20 C.F.R. Part 404, Subpart P, Appendix 1.04(A) applies to Plaintiff's disability determination, and that the ALJ committed reversible error by not properly evaluating the Listing or the equivalency standard. (Doc. No. 11-1 at 8, 9.)

Defendant argues that an ALJ is not required to specifically analyze particular listings, and ergo the failure of the ALJ to consider Listing 1.04(A) was permissible. (Doc. No. 13-1 at 19.)

### 1. <u>Applicable Law</u>

A claimant's "impairment(s) is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526. Ordinarily, the ALJ is not required, as a matter of law, to state why a claimant failed to satisfy every different section of the Listing of Impairments. <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1201 (9th Cir. 1990). Moreover, it is not error where an ALJ concludes that a claimant's conditions do not equal a listed impairment when a claimant offers no theory, plausible or otherwise, as to how their conditions equal a listed impairment. <u>Lewis v. Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001).

However, when determining whether a claimant's conditions medically equal a listed impairment, the ALJ must discuss and evaluate the relevant evidence when coming to a conclusion. <u>Id</u>. Further, "The ALJ must explain adequately [his/her] evaluation of alternative tests and the combined effects of the impairments[]" in this determination. <u>Marcia v. Sullivan</u>, 900 F.2d 172, 176 (9th Cir. 1990). When a claimant presents evidence pertaining to the substantiation of their conditions equaling a listed impairment, it is insufficient for the ALJ to merely conclude that the evidence does not equal a listed impairment; the ALJ must consider and comment on that evidence. <u>See id</u>.

### 2. <u>Discussion</u>

Listing 1.04(A) describes disability "[d]isorders of the spine . . . resulting in compromise of a nerve root[] [w]ith[ e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising[.]" 20 C.F.R. Pt. 404, Subpt. P, Appx. 1.

13cv1407

On August 26, 2011, approximately six months prior to Plaintiff's disability hearing with the ALJ, Plaintiff's counsel submitted to the ALJ a Request for an On-the-Record Decision regarding whether Plaintiff meets Listing 1.04(A). (AR 112-13.) In this Request, Plaintiff's counsel recited medical evidence from the Administrative Record which indicated that Plaintiff would meet Listing 1.04(A), including: Plaintiff's decreased sensation to light touch in Plaintiff's spine and right foot, x-rays showing disc collapse, and diagnoses of symptoms and signs consistent with spinal spondylosis with radiculitis. See id. If these symptoms are taken as uncontroverted, they would seem to require a finding of disability under Listing 1.04(A).

During Plaintiff's disability hearing on February 7, 2012, medical expert John Axline commented on Plaintiff's decreased sensation in his right foot, which he admitted would meet Listing 1.04(A). (AR 53.) However, Dr. Axline determined that the decreased sensation was subjective, and not due to discogenic nerve impairment; Dr. Axline explained that if there was such nerve damage that would equal a listing, Plaintiff would "have injuries and burns and [Plaintiff] would snag [him]self on objects or footwear or stockings . . . ." (AR 54.) Accordingly, Dr. Axline testified that Plaintiff does not equal a listed disability.

The ALJ's opinion conveyed Dr. Axline's determination that Plaintiff does not equal a listing: "the medical expert testified that there is no objective medical evidence of record that has indicated medical findings that would satisfy the severity requirement for any listed impairments." (AR 14.) The ALJ proceeded to analyze in depth whether Plaintiff's impairments combine to medically equal the criteria in Listing 12.04. (See AR 15.) However, the ALJ's opinion is void of any discussion at all regarding Listing 1.04(A). (See AR 14-15.) The ALJ's failure to do so constitutes error.

Listing 1.04(A) deals with impairments of the spine, the impairments that are most significantly pertinent to Plaintiff's disability claims. Furthermore, Plaintiff's counsel submitted a pre-hearing decisional request regarding Listing 1.04(A). (AR 112-

13.) The ALJ had a duty to evaluate the evidence pertaining to this alleged disability in his opinion. <u>Marcia</u>, 900 F.2d at 176. Where a claimant offers no theory, plausible or otherwise, as to how their conditions equal a listed impairment, the ALJ is not required to comment on it. <u>Lewis v. Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001). However, Plaintiff's counsel's pre-hearing Request for a decision regarding Listing 1.04(A) conveyed a plausible theory as to how Plaintiff's conditions equal this Listing. (<u>See</u> AR 112.) The ALJ's blanket assertion that Plaintiff's impairments fall short of medically equaling a listed disability is insufficient without further evaluation and comment on the pertinent evidence. <u>Marcia</u>, 900 F.2d at 176. Thus, this Court remands this case so that the ALJ may address the issue of whether Plaintiff's impairments medically equal Listing 1.04(A).

In sum, the Court finds that the ALJ neglected his duty to discuss whether Plaintiff's impairments medically equal Listing 1.04(A). The Court recommends Plaintiff's Motion for Summary Judgment on this issue be GRANTED, Defendant's Cross-Motion for Summary Judgment be DENIED, and the ALJ, upon remand, be required to consider this issue.

### VII.

### <u>CONCLUSION</u>

For the reasons set forth herein, it is RECOMMENDED that Plaintiff's Motion for Summary Judgment be GRANTED, that Defendant's Cross-Motion for Summary Judgment be DENIED, and the case should be remanded for further proceedings. This Report and Recommendation will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(1988) and Federal Rule of Civil Procedure 72(b).

IT IS ORDERED that no later than <u>September 4, 2014</u>, any party to this action may file written objections with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

13cv1407

1    IT IS FURTHER ORDERED that any reply to the objections shall be filed with

2  the Court and served on all parties no later than September 18, 2014. The parties are

3  advised that failure to file objections within the specified time may waive the right to

4  raise those objections on appeal of the Court's order. Martinez v. Ylst, 951 F.2d 1153

5  (9th Cir. 1991).

6  IT IS SO ORDERED.

7

8  DATED:  August 4, 2014

9

10

11  Hon. William V. Gallo
    U.S. Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13cv1407